1  Jefferson T. Stamp (SBN 187975)
   Attorney at Law
2  15650-A Vineyard Blvd., #146
   Morgan Hill, CA 95037
3  Telephone: (408) 607-7263

4  In Pro Per

**FILED**

JUN 03 2009

CLERK
United States Bankruptcy Court
San Jose, California

5

6

7              UNITED STATES BANKRUPTCY COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9                    SAN JOSE DIVISION

10

11  In re:                          Case No.: 08-55860-RLE-11

12     TVIA, INC.,                  **REPLY MEMORANDUM IN SUPPORT
                                    OF MOTION FOR AN ORDER
13           Debtor.               DIRECTING THE CHAPTER 11
                                    TRUSTEE TO PAY ADMINISTRATIVE
14                                  EXPENSES PURSUANT TO 11 U.S.C. §
                                    503(b)(1)(A)**
15
                                    Date:      June 10, 2009
16                                  Time:      10:30 a.m.
                                    Courtroom: 3099
17                                  Judge:     Hon. Roger L. Efremsky

18

19

20

21

22

23

24

25

26

27

28

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER DIRECTING THE CHAPTER 11

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 1 of 16

## Table of Contents

I.      INTRODUCTION.................................................................................1

II.     LEGAL ARGUMENT...........................................................................2

    A. Mr. Stamp's employment agreement, approved pre-petition, is binding...................2

    B. Mr. Stamp's employment agreement was made in the ordinary course of business......3

        1. The vertical dimension test is satisfied................................................4

        2. The horizontal dimension test is satisfied...........................................5

    C. The Equity Committee's arguments are unpersuasive.....................................6

        1. The new compensation package arose from the Debtor's prospective sale........6

        2. The Debtor was mostly successful in the bankruptcy proceedings................8

        3. The Equity Committee's e-mail "objection" was defective.........................9

    D. Equity requires the payment of the "retention bonus" to Mr. Stamp......................10

    E. The "potential offsets" are frivolous and cannot be used to avoid paying wages.........11

    F. The "insider" issue under Section 503(c) has been conceded...............................12

III.    CONCLUSION...............................................................................13

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER DIRECTING THE CHAPTER 11

## Table of Authorities

**Federal Cases:**

*In re DeLuca Distributing, Co.*, 38 B.R. 588 (*Bankr.*, N.D. OH 1984)..........................3, 9, 10

*In re Enterprise Acquisition Partners, Inc.*, 319 B.R. 626 (9th Cir. B.A.P. 2004).....................13

*In re Lemanski*, 56 B.R. 981 (W.D. WI 1986)..................................................13

*In re Metro Fulfillment, Inc. (Gonzalez v. Gottlieb)*, 294 B.R. 306 (9th Cir. B.A.P. 2003)...........12

*In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (*Bankr.*, D. DE 2007)...............................3

*In re Shuman*, 81 B.R. 583 (9th Cir. B.A.P. 1987)..............................................13

*In re Standard Laundry Co.*, 116 F. 476, 478 (9th Cir. 1902)..................................9, 10


**Federal Statutes:**

11 U.S.C. § 363(c)(1).............................................................................3

11 U.S.C. § 503(c).......................................................................10, 12-13


**California Cases:**

*Phillips v. Gemini Moving Specialists*, 63 Cal. App. 4th 563, 74 Cal. Rptr. 2d 29 (1998)...........12

*Smith v. Woodville*, 66 Cal. 398 (1885)..........................................................3


**California Statutes:**

Labor Code § 203..............................................................................12, 13

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER DIRECTING THE CHAPTER 11

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 3 of
16

## I.    INTRODUCTION

The Chapter 11 Trustee has not filed an opposition to Mr. Stamp's motion for payment of the retention bonus. Instead, the Trustee has relied entirely on the opposition filed by the Equity Committee. The failure of the Trustee to independently evaluate the wage claim of a former employee is evidence of an intentional violation of the California Labor Code which requires the prompt payment of wages after termination of employment. As established in the moving papers, the Trustee is obligated to comply with the Labor Code in the operation of the business during this Chapter 11 proceeding. He cannot avoid this responsibility by delegating it to the Equity Committee.

In any event, the opposition filed by the Equity Committee is undermined and contradicted by the Trustee's own actions. Upon assuming his office, the Trustee personally approved Mr. Stamp's pay at the rate of $180,000 per year as set forth in the October 13, 2008, employment agreement (the "New Employment Agreement"). The Trustee personally signed Mr. Stamp's payroll check which reflected the new rate. (Stamp Reply Declaration, ¶ 18) Moreover, the Trustee's approval was given after the Trustee was informed by the Debtor's accounting manager and human resources manager that the Debtor had previously decided to honor the raise set forth in the New Employment Agreement. (Id., ¶¶ 14-15, 17)

More importantly, the Equity Committee has completely ignored Mr. Stamp's equitable argument. The Equity Committee has not denied that the Debtor received benefits under the New Employment Agreement. Instead, the Equity Committee argues that "the swapping of severance benefits for a retention bonus was not, however, a substitution of equals." The Equity Committee has missed the point. The Debtor voluntarily chose to enter into the New Employment Agreement which terminated Mr. Stamp's severance agreement and prior bonus packages. Neither the Debtor nor the Trustee ever made any effort to rescind or repudiate the New Employment Agreement. (Stamp Reply Declaration, ¶ 19) And neither did they ever inform Mr. Stamp that the July 2007 severance agreement or prior bonuses would be reinstated. (Id.)

On the contrary, the Debtor and the Trustee both honored the New Employment Agreement by increasing the pay rate to $180,000 per year. (Stamp Reply Declaration, ¶¶ 14-15, 18) Thus,

1

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 4 of 16

both the Debtor and the Trustee took actions confirming that the New Employment Agreement was operative. Mr. Stamp resigned his position under the reasonable belief that the New Employment Agreement was the operative agreement and that the Severance Agreement had been terminated. (Stamp Reply Declaration, ¶ 20) The Trustee cannot have it both ways, and the Equity Committee has not disputed that the New Employment Agreement was an "arm's length transaction." It is sufficient that the estate received the intangible benefit of "labor peace." As a result, the Trustee is now "estopped" from denying the burdens of the New Employment Agreement. The Trustee is also bound under both promissory and equitable estoppel due to Mr. Stamp's detrimental reliance.

In its only argument in opposition, the Equity Committee claims that the New Employment Agreement was outside the "ordinary course of business," and thus needed to be approved by the Court. As mentioned above, this is completely contradicted by the Trustee's own actions when he personally approved Mr. Stamp's pay rate at $180,000 per year. Moreover, the argument is based on the faulty premise that the New Employment Agreement was "entered into" when it was signed, one day after the Debtor's petition was filed. The New Employment Agreement was approved and finalized by the Debtor's Board of Directors on October 13, 2008. (Stamp Reply Declaration, ¶ 10) The Board's pre-petition resolution constitutes an enforceable agreement. That the agreement took a few days to memorialize does not alter the effective date of the agreement.

Under any circumstances, the New Employment Agreement was entered into "in the ordinary course of business." Contrary to the Equity Committee's assertions, the New Employment Agreement did not represent a "radical departure" from Mr. Stamp's pre-bankruptcy compensation. Mr. Stamp's post-bankruptcy retention bonus and salary are completely consistent with the Debtor's pre-petition practices and with the compensation and raises provided to Mr. Stamp during his pre-petition employment with the Debtor.

## II.    LEGAL ARGUMENT

### A. Mr. Stamp's employment agreement, approved pre-petition, is binding.

The Equity Committee's entire objection relies on the mistaken assumption that the New Employment Agreement was entered into on the date the agreement was signed. However, Mr. Stamp's agreement was finalized and approved in a resolution adopted by the Debtor's Board of

2

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 5 of 16

Directors at their meeting on October 13, 2008, two days prior to the Debtor's bankruptcy filing. (Stamp Reply Declaration, ¶ 10) Such a resolution constitutes an enforceable contract. *See Smith v. Woodville*, 66 Cal. 398, 399 (1885)("The resolution … is evidence that the president's salary was fixed by contract….").

The pre-petition approval of Mr. Stamp's employment agreement via board resolution is equally binding. *See In re DeLuca Distributing Co.*, 38 B.R. 588, 590 (Bankr., N.D. OH 1984). In the *DeLuca* case, the debtor filed bankruptcy after a collective bargaining agreement had been negotiated, but before the agreement could be reduced to writing. Nevertheless, the court found that the pre-petition agreement was binding: "Although the Union and the Association did not reduce their agreement to writing until January 1984, the court finds that the parties had a binding contract before that date." *Id.* (emphasis added). In this case, it is the writing itself, signed by the Debtor, that admits Mr. Stamp's New Employment Agreement was "effective as of October 13, 2008." (See Stamp Declaration, Exhibit E) The Trustee is bound by this admission.

The Equity Committee itself admitted that: "the debtor entered into new employment agreements with each of its employees, effective just prior to the Petition Date." (See Equity Committee's Memorandum of Points and Authorities in Support of Motion for Order Appointing Chapter 11 Trustee, 9:6-7) The Equity Committee is similarly bound by its own admission which it made after "Copies of the employment agreements were provided to the Committee by the debtor…." (Id., FN 21)

**B. Mr. Stamp's employment agreement was made in the ordinary course of business.**

Where an employee's new compensation in bankruptcy represents a continuation of the debtor's past practice, then the new compensation is considered to be "in the ordinary course of business" under 11 U.S.C. Section 363(c)(1). *See In re DeLuca Distributing Co.*, 38 B.R. 588, 594 (*Bankr.*, N.D. OH 1984)("The court finds, therefore, that where the debtor's employees have continually been covered by a collective bargaining agreement, a new collective bargaining agreement is a transaction in the ordinary course of business…."); *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 798 (*Bankr.*, D. DE 2007)("the Debtors' modification of the 2006 [bonus program] was consistent with the Debtors' pre-petition practices – at least for the somewhat limited

3

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 6 of 16

period of 2003-2005" and was thus considered to be approved in "ordinary course").

### 1. The vertical dimension test is satisfied.

Mr. Stamp's New Employment Agreement was not a "radical departure" from his prior compensation. Unlike the cases cited by the Equity Committee (which involved substantial severance packages for employees who never previously had them), Mr. Stamp has had a retention bonus as part of his compensation since July 2007, more than 15 months prior to the Debtor's bankruptcy. Thus, the continuation of a retention bonus for Mr. Stamp during the bankruptcy was consistent with the Debtor's pre-petition practice.

Moreover, the magnitude of the raise that Mr. Stamp received just prior to the Debtor's bankruptcy is consistent with, and actually lower than, the magnitude of his past raises; in fact, the overall potential compensation was almost exactly the same, differing by a mere $5,000:

— In July 2007, after Mr. Stamp's <u>first 15 months</u> with the Debtor, he was provided a raise in salary from $99,000 to $150,000 per year (more than 50%), an increase in annual bonus package from $10,000 to $40,000 (300%), plus a new severance agreement potentially worth 6 months of salary.

— In October 2008, after Mr. Stamp's <u>second 15 months</u> with the Debtor, he was provided a raise in salary from $150,000 to $180,000 per year (20%) and an increase in annual bonus package from $40,000[1] to $90,000 (125%). However, the severance agreement potentially worth 6 months salary was terminated.

Thus, not only were Mr. Stamp's raises provided over the same time period of 15 months, the raise provided in the New Employment Agreement was actually less in terms of overall percent (for both salary and bonus) than the raise that Mr. Stamp received in July 2007. In addition, the raise in the New Employment Agreement was conditioned upon the termination of the severance agreement. As a result, the total potential compensation for Mr. Stamp under the New Employment Agreement is almost exactly the same amount as Mr. Stamp's pre-bankruptcy compensation.

---

[1] This amount reflects the $10,000 performance bonus in Mr. Stamp's March 2006 offer letter and the non-discretionary $30,000 retention bonus confirmed in the September 2007 letter. The Trustee states that $10,000 retention bonus was superseded by the 2007 retention bonus. However, there is nothing in the September 2007 letter that extinguishes the earlier bonus. However, even if the Trustee was correct, the magnitude of the raise would have been from $30,000 to $90,000 (200%). This is still lower than the previous raise in bonus.

4

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER DIRECTING THE CHAPTER 11

Specifically, the total potential amount of annual compensation under the New Employment Agreement is $270,000. Under the raises and severance agreement provided in July 2007, the total potential compensation is $265,000. An increase of $5,000 in total potential compensation is not a "radical departure" from the previous compensation package, especially considering the lost value of Mr. Stamp's stock options as discussed below.

The Debtor's pre-petition practices also included attempts to adjust employee stock options to preserve their retentive effect. For example, in May 2007, recognizing that the employee stock options had become worthless, the Debtor voluntarily re-priced the stock options for all employees to $0.29 per share. The re-pricing of the options for the Debtor's officers and directors, which represented a substantial change in beneficial ownership impacting shareholder value, was publicly disclosed in Form 4 filings with the S.E.C. (Stamp Reply Declaration, ¶ 6) Even so, no shareholder ever filed any objection with the Debtor, ever took any corrective action or ever filed any shareholder complaint. (Id., ¶ 7) Thus, the Debtor's pre-petition practices included substantial adjustments in compensation for the overpriced options and retention-based compensation for its employees, without any objection from shareholders.

Notwithstanding the Debtor's pre-petition efforts to redress the overpriced options, the Debtor's stock price continued to fall to as low as $0.03 per share prior to the bankruptcy. Once again, the employee stock options had sunk "below water" and had become virtually worthless. Based on the Debtor's past practice, it was reasonable to expect that the Debtor would have once again taken some corrective action to resurrect the retention component of employee compensation. In this sense, the new "retention bonus" can be seen as a continuing effort to compensate for the worthless stock options that were provided to the Debtor's employees, including Mr. Stamp. This is confirmed by the Compensia Report discussed below. Since no shareholder ever objected to this past practice of redressing the overpriced options, it was reasonable not to expect any objection for similar efforts taken during the Debtor's bankruptcy. As a result, the "vertical dimension test" is satisfied.

### 2. The horizontal dimension test is satisfied.

The Debtor retained the consulting firm Compensia to provide recommendations for

5

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 8 of 16

employee compensation which were consistent with industry practice. (<u>Stamp Reply Declaration</u>, ¶ 9 (Exhibit H – "Compensia Report" at 3 ("Consider market practice for various compensation elements and total program cost"))

Compensia recommended that the Debtor's employees be provided a retention bonus in the total amount of 50% annual salary to vest in equal monthly installments. Compensia's recommendation was based on its study of transaction-related compensation for 100 public companies. (<u>Id.</u> at 17). In that study, Compensia found that 35% of public companies have retention bonuses. (<u>Id.</u> at 4). Compensia's recommendation of the retention bonuses was based on the fact that the employee stock options had become worthless due to the steep decline in the company's stock price. (<u>Id.</u> at 2)("Current Tvia option holdings provide no retention value...").

Thus, the retention bonuses were considered necessary by Compensia to "fairly compensate" employees who would be driving the Debtor's penultimate transaction and distribution to shareholders. (<u>Id.</u> at 3) According to Compensia, the retention bonuses represented the typical financial compensation that had been approved by similarly situated companies. As a result, the "horizontal dimension test" is satisfied.

### C. The Equity Committee's arguments are unpersuasive.

The Equity Committee's arguments can be summarized as follows: (1) the New Employment Agreement arose out of the developments unique to bankruptcy, (2) opposition to the New Employment Agreement should have been expected based on the contentiousness of the Debtor's bankruptcy and (3) the Equity Committee would have objected if given the chance. All three of these arguments are ultimately unpersuasive and even contradicted by the Equity Committee's own actions and statements in these proceedings.

### 1. The new compensation package arose from the Debtor's prospective sale.

It cannot be overemphasized that the Debtor is and has been a solvent company prior to the bankruptcy. The Debtor regularly paid its non-disputed creditors and did not have to file bankruptcy. The Debtor's problem was that, given the past accounting irregularities and fraud by the sales team, audited financial statements could not be generated. Thus, the Debtor could not continue to operate as a public company without filing financial statements. As a result, the Debtor

6

needed some sort of exit strategy in which it could sell its assets and complete a distribution to shareholders. Bankruptcy was just <u>one vehicle</u> out of many that the Debtor considered to complete the sale of assets. (<u>Stamp Reply Declaration</u>, ¶ 11) This is also confirmed in the Compensia Report which states: "Tvia is currently exploring potential compensation arrangements in the face of a possible sale <u>or</u> bankruptcy/liquidation of the Company." (<u>See</u> <u>Compensia Report</u> at 2 (emphasis added)) Thus, the new compensation packages proposed by Compensia were tied directly to the Debtor's efforts to <u>sell the assets</u>. Bankruptcy just happened to be the best vehicle for the sale as was later determined by the Debtor's Board of Directors.

The Equity Committee also claims that the new employment agreements were adopted because "the Severance Agreement would likely be unenforceable in the event of a bankruptcy filing." Nevertheless, the Equity Committee has failed to provide any analysis or explanation to support this naked assertion.

The Severance Agreement states that a "Change of Control" means, among other things, "(3) The sale, transfer or other disposition of all or substantially all of the Company's assets other than in connection with a dissolution of the Company." According to the Equity Committee, the Debtor already completed "a sale of substantially all the debtor's assets" in the Mediatek transaction prior to the bankruptcy. (<u>See</u> <u>Equity Committee's Memorandum of Points and Authorities in Support of Motion for Order Appointing Chapter 11 Trustee</u>, 14:1-6) The Debtor's former V.P. of Engineering, David Medin, has also similarly claimed that the Mediatek transaction triggered his own severance agreement and sued the Debtor in Superior Court. (<u>Stamp Reply Declaration</u>, ¶ 8) Given that the Debtor's five remaining employees each had the substantially same severance agreement as Medin, the termination of those agreements meant the elimination of five potential lawsuits. (<u>Id.</u>)

While Mr. Stamp disagrees that the Mediatek deal was a sale of all or substantially all the Debtor's assets, the point is that various claims could be made under the severance agreements if they were still in effect. For example, the sale of substantially all the Debtor's assets could have already occurred during the Debtor's bankruptcy by virtue of the Debtor's "end of life" sales to customers. In December 2008, the Debtor completed more than $1.5 million in sales to customers

7

Case: 08-55860   Doc# 339   Filed: 06/03/09   Entered: 06/03/09 15:44:28   Page 10 of 16

after announcing its products to be "end of life" and of questionable availability thereafter. (Stamp Reply Declaration, ¶ 12)  The Debtor has not been able to generate sales anywhere close to that amount in the subsequent months, and the Debtor's investment banker reported that it had received no inquiries about the Debtor's remaining assets. (Id., ¶ 13)  Moreover, by virtue of announcing the Debtor's intention to sell its assets in the bankruptcy, it is probable that the employee severance agreements would have eventually vested.  At the very least, any termination of employment prior to the imminent vesting of the severance agreements would amount to a breach of the covenant of good faith and fair dealing.

Thus, it is not nearly good enough for the Equity Committee, or anyone else, to declare by fiat that the pre-petition severance agreements were unenforceable in bankruptcy.  The real question is could anyone make a plausible claim under them, and was there any value in eliminating the uncertainty of potential disputes involving these agreements.  Having been sued once on the severance agreement already by David Medin, the Debtor in its business judgment thought the answer was yes.  Accordingly, the Debtor (with the assistance of Wilson Sonsini) devised new employment agreements which terminated the pre-petition severance agreements.  This decision must be viewed at the time the decision was made just prior to the bankruptcy, i.e., when the uncertainties were compounded by the contingencies of future events; not after the fact when everything has already played out.

**2. The Debtor was mostly successful in the bankruptcy proceedings.**

The Equity Committee argues that one should have expected opposition to any motion by the Debtor to approve the New Employment Agreement for Mr. Stamp based on the contentiousness of the Debtor's bankruptcy.  However, the majority of the disputes in the Debtor's bankruptcy were related to the S.E.C. investigation and litigation involving the Debtor's former employees.  The Debtor was successful in nearly every dispute that was resolved by the Bankruptcy Court, such as opposing to the former employees' request for documents in both the Section 1601 action and via Rule 2004, obtaining a stay of the Insider Trading lawsuit, remanding the Trade Secret lawsuit, approving the Debtor's insurance policy as an asset of the estate and extending the exclusivity period for adoption of a plan.  The Equity Committee generally supported the Debtor in

8

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 11 of 16

these efforts. In the only direct dispute between the Equity Committee and the Debtor, the Motion to Appoint a Chapter 11 Trustee, the Court ruled that the Equity Committee failed to meet its burden.

Given the largely successful track record of the Debtor during the bankruptcy, the Debtor most likely would have been successful in any motion to approve Mr. Stamp's New Employment Agreement. Moreover, the approval of the New Employment Agreement by the Board of Directors occurred pre-petition, at the October 13, 2008, board meeting. This was before the bankruptcy was even filed and before any contentiousness occurred. In contrast, in the cases cited by the Equity Committee, the management approved the new severance agreements after the bankruptcy had been in process for several months and in which the management was mostly unsuccessful. That is not the case here.

### 3. The Equity Committee's e-mail "objection" was defective.

Finally, the Equity Committee insists that it did object to the New Employment Agreement in the form of an e-mail sent in February 2009. (See Katz Declaration, Exhibit A) However, a careful inspection of the "objection" shows that the concern was directed towards both the "retention bonus" and the "severance."

Specifically, Mr. Katz states: "I would appreciate a response tonight regarding a stipulation that no payments will be made to employees on account of retention bonuses or severance" (emphasis added).

First, there was no objection to the entirety of the New Employment Agreement or the payment of salary at the annual rate of $180,000 as set forth therein. The Equity Committee did not request that the terminated Severance Agreement be reinstated or that the other benefits received by the Debtor under the New Employment Agreement be returned. In fact, it was just the opposite. The Equity Committee wanted it both ways; it wanted to stop payment on both the retention bonus and the severance. Nevertheless, the Equity Committee is not entitled to a line item veto in which it can choose to reject portions of the agreement it does not like while retaining its benefits. *See In re DeLuca Distributing Co.*, 38 B.R. 588, 594 (*Bankr.*, N.D. OH 1984); *In re Standard Laundry Co.*, 116 F. 476, 478 (9th Cir. 1902).

9

Case: 08-55860   Doc# 339   Filed: 06/03/09   Entered: 06/03/09 15:44:28   Page 12 of 16

Furthermore, the Equity Committee's partial objection to the "retention bonus" was based on Section 503(c), and not that the New Employment Agreement was made outside the ordinary course of business. (See Equity Committee's Memorandum of Points and Authorities in Support of Motion for Order Appointing Chapter 11 Trustee, 9:12-16)

The Equity Committee also limited its objection to the payment of retention bonuses to "insiders" under Section 503(c): "To date the debtor has wisely refrained from paying the retention bonuses called for in the new employment agreements. But this restraint does nothing to lessen the impropriety of the attempted end-run around the provisions of Section 503(c) of the Bankruptcy Code, which prohibit the debtor from making any payment on an obligation incurred to an insider in order to induce such insider's retention." (Id.)

Thus, based on the Equity Committee's own past statements in this case, one could not expect an "ordinary course" objection to the payment of a retention bonus to a non-insider employee like Mr. Stamp. The Equity Committee is bound by its admission that there was a distinction between insiders and non-insider employees. (Id., 9:5-7 ("Other insiders and employees too benefited ... as the debtor entered into new employment agreements with each of its employees, effective just prior to the Petition Date.)(emphasis added))

**D. Equity requires payment of the "retention bonus" to Mr. Stamp.**

Equity provides a complete and independent basis for ordering payment of the retention bonus. The acceptance of "labor peace" provided by the New Employment Agreement is a sufficient benefit to operate as an estoppel against the estate. *See In re DeLuca Distributing Co.*, 38 B.R. 588, 594 (*Bankr.*, N.D. OH 1984); *In re Standard Laundry Co.*, 116 F. 476, 478 (9th Cir. 1902). In *DeLuca*, the debtor negotiated a collective bargaining agreement as part of a distribution association. The debtor "never attempted to withdraw from the Association" and "accepted the benefits of labor peace provided by the New Agreement." *Id.* "Having been authorized by this court to operate its business and having entered into a collective bargaining agreement, the debtor cannot now claim that it lacked authority." *Id.* As a result, the court held that: "Equity dictates that the debtor is estopped from now claiming that it is not bound by the New Agreement." *Id.*

Similarly, here, neither the Debtor nor the Trustee ever attempted to withdraw from Mr.

10

Case: 08-55860   Doc# 339   Filed: 06/03/09   Entered: 06/03/09 15:44:28   Page 13 of 16

Stamp's New Employment Agreement. (Stamp Reply Declaration, ¶ 19) On the contrary, both the Debtor and the Trustee voluntarily paid Mr. Stamp at the rate of $180,000 per year provided under the New Employment Agreement. (Id., ¶¶ 14-15, 18) Neither the Debtor nor the Trustee ever attempted to rescind or repudiate the new agreement, and they never informed Mr. Stamp that the original Severance Agreement or previous bonuses would be reinstated. (Id., ¶ 19)

Instead, the Debtor and the Trustee both accepted the benefits of "labor peace" in not having to deal with any claims under Mr. Stamp's Severance Agreement or the older bonus package. For example, had the Severance Agreement been in place Mr. Stamp would not have resigned and would have actually had a claim for $90,000 after his inevitable termination. (Id., ¶ 20) Thus, the estate has faired much better under the New Employment Agreement, because Mr. Stamp's total claim has been reduced in half to $45,000.

In addition, Mr. Stamp would have had a claim for $15,000 under his prior retention bonus and for an additional $10,000 under his original performance bonus. (Id., ¶ 20) Though the Trustee argues the performance bonus was extinguished prior to the New Employment Agreement, this is not the case. There is nothing in writing to this effect and the lack of payment in 2008 is not determinative. The performance bonus was based on objectives "to be defined." If the Debtor did not comply, it represents a breach, not extinguishment.

Contrary to the Trustee's assertion, Mr. Stamp's bonus packages were eliminated by the New Employment Agreement, and Mr. Stamp has been prejudiced in that he has not been able to make these claims. By adopting the more straightforward compensation package in the New Employment Agreement, the estate has benefitted from a certain amount of "labor peace" in not having to deal with the myriad of more extensive claims under the older compensation package.[2] Moreover, under the doctrines of promissory and equitable estoppel, there is no need for the estate

---

[2] The Debtor paid Mr. Stamp $7,500 in December 2008 and $2,500 in February 2009 after learning that the payroll had not been changed to reflect the New Employment Agreement. The Debtor realized that it had mistakenly been paying Mr. Stamp under the old pay rate of $150,000 per year ($12,500 per month). The Debtor determined that Mr. Stamp should have been paid at the rate of $180,000 per year ($15,000 per month) as provided in the New Employment Agreement. Consequently, in February 2009, a "catch up" payment of $2,500 was issued to Mr. Stamp. The $7,500 payment made in December was the equivalent amount that was owed to Mr. Stamp under the new rate for the period from October to December 2008, so no catch up payment was needed for that period. This information was provided to the Trustee by the Debtor's accounting manager and human resources manager prior to the Trustee's approval of Mr. Stamp's final paycheck on April 15, 2009.

Case: 08-55860    Doc# 339    Filed: 06/03/09    Entered: 06/03/09 15:44:28    Page 14 of 16

1  to have received any benefit. Mr. Stamp's detrimental reliance is sufficient, in and of itself, to

2  establish that the New Employment Agreement should be enforced due to equity.

3  **E. The "potential offsets" are frivolous and cannot be used to avoid paying wages.**

4  In his joinder, the Trustee states that he is "investigating certain claims" against Mr. Stamp

5  and that these may result in "potential offsets" against payment of administrative expenses.

6  However, the Trustee has not identified a single claim. To allow the Trustee to avoid paying wages

7  to former employees any time he imagines an entirely non-descript and hypothetical claim would

8  vitiate the holding of *In re Metro Fulfillment, Inc. (Gonzalez v. Gottlieb)*, 294 B.R. 306, 311-313

9  (9th Cir. B.A.P. 2003). In that case, the 9th Circuit ruled that a Chapter 11 Trustee must comply

10  with the California Labor Code in the operation of its business. The court assessed penalty wages

11  under Labor Code Section 203 after the failure to pay employees their owed wages for post-petition

12  employment. This assessment was made in recognition of Labor Code's requirement that wages to

13  employees be made "promptly." *See Phillips v. Gemini Moving Specialists*, 63 Cal. App. 4th 563,

14  574, 74 Cal. Rptr. 2d 29, 36 (1998).

15  Under the argument posed by the Trustee, any Chapter 11 debtor can avoid paying wages to

16  its employees by announcing that he is investigating the possibility of claims against them. He

17  doesn't know what claims there might be, but just the investigation alone would allow the Trustee

18  to avoid complying with the Labor Code. This absurd position cannot be countenanced by the

19  Court.

20  It is for this reason that an employer cannot use any setoff against wages under California

21  law. "In summary, it is clear from the many Labor Code sections set out above ... that there is in

22  this state a fundamental and substantial public policy protecting an employee's wages, and that

23  protection includes freedom from setoffs...." *Phillips v. Gemini Moving Specialists*, 63 Cal. App.

24  4th 563, 574, 74 Cal. Rptr. 2d 29, 36 (1998). Since the Trustee is required to operate the business in

25  Chapter 11 in compliance with the Labor Code, the Trustee cannot properly claim a setoff to avoid

26  paying wages to a former employee.

27  **F. The "insider" issue under Section 503(c) has been conceded.**

28  The Equity Committee has not disputed that Mr. Stamp's dealings with the Debtor were

12

Case: 08-55860   Doc# 339   Filed: 06/03/09   Entered: 06/03/09 15:44:28   Page 15 of 16

consistently at "arm's length." Thus, Mr. Stamp cannot be an "insider" as a matter of law. *In re Lemanski*, 56 B.R. 981, 983 (*Bankr.*, W.D. WI 1986); *followed by In re Shuman*, 81 B.R. 583, 586 (9th Cir. B.A.P. 1987); *followed by In re Enterprise Acquisition Partners, Inc.*, 319 B.R. 626, 633, FN 5 (9th Cir. B.A.P. 2004).

Nevertheless, the Equity Committee asks for the opportunity to conduct discovery on the issue of whether Mr. Stamp was a "person in control of the debtor." However, the Equity Committee has not even attempted to provide any "offer of proof" or posited any theory explaining how Mr. Stamp could have been "in control" of the Debtor in light of the undisputed facts in Mr. Stamp's declaration. Given this total absence of rationale supporting discovery, the request should be denied.

The Equity Committee has already engaged in an extensive investigation of the Debtor's affairs: "the Committee reviewed extensive documents (provided by the debtor)" in "nearly five weeks of intense efforts." (See Equity Committee's Memorandum of Points and Authorities in Support of Motion for Order Appointing Chapter 11 Trustee, 2:3-5) The documents provided by the Debtor included the employee agreements. (Id., FN 21) Moreover, the Trustee has complete access to the Debtor's books and records and yet failed to provide any meaningful opposition. The undisputed facts set forth in Mr. Stamp's declaration establish that he could not have been an "insider" as a matter of law. Both the Equity Committee and the Trustee have failed to present any facts which alter that conclusion.

## III. CONCLUSION

For all the foregoing reasons, the Court should order the Chapter 11 Trustee to pay Mr. Stamp's "retention bonus" in the amount of $45,000. In addition, the Court should order the payment of penalty wages to Mr. Stamp in the amount of $22,500, pursuant to California Labor Code Section 203.

Dated: June 3, 2009

Respectfully submitted,

By: _____
Jefferson T. Stamp

13

Case: 08-55860     Doc# 339     Filed: 06/03/09     Entered: 06/03/09 15:44:28     Page 16 of 16